# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:17-cv-343-FDW

| | |
|---|---|
| DARRYL BOYD ADKINS, | ) |
| Plaintiff, | ) |
| vs. | ) **ORDER** |
| PAMELA MARTIN, et al., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on Defendant Pamela Martin's Motion for Summary Judgment, (Doc. No. 66). Also pending are several Motions filed by the *pro se* Plaintiff. See (Doc. Nos. 65, 77).

## I.  BACKGROUND

*Pro se* Plaintiff's Amended Complaint, (Doc. No. 17), passed initial review a claim that Defendant Martin used excessive force against him, (Doc. No. 18). Defendant Martin has now filed a Motion for Summary Judgment, (Doc. No. 66), that is presently pending before the Court. Plaintiff has filed a Response and Defendants had the opportunity to reply. Plaintiff has also filed Notice Motion to Clerk of Court of Defendants Pamela Martin is Not No Official State Employee, (Doc. No. 65), and a Second Request for Production of Documents, (Doc. No. 77), that are pending consideration.

**(1)  Amended Complaint** (Doc. No. 17)

Plaintiff alleges in the Amended Complaint that Defendant Martin came to escort Plaintiff from the recreation cell back to his own cell on October 6, 2017. Plaintiff told Defendant Martin that he had been asking her for the television remote control ever since she put him in the recreation

1

cell. She responded that she had been busy and forgot. Defendant Martin cuffed Plaintiff's hands in front of his body, removed him from the cell, and began escorting him while gripping his arm tightly. Plaintiff told Defendant Martin she was grabbing him too tightly and to loosen her grip. She did not say anything and gripped his arm tighter. Plaintiff stopped walking, looked Defendant Martin in the eyes, and said she is grabbing him too hard and to loosen up. They started arguing. Plaintiff was about to continue walking when Defendant Martin shoved him by the arm and pushed him against the wall. Defendant Martin said "don't think 'cause she a old white lady cause she can still get in it and beat my ass [meaning she can fight]." (Doc. No. 17 at 5). Plaintiff, who was still pinned to the wall, started laughing. Defendant Martin pulled him off the wall, walked him to his cell, and called on her walkie talkie for the control booth to open Plaintiff's cell door. Defendant Martin was still gripping Plaintiff's arm tightly and Plaintiff was still laughing at her.

When the cell door opened, Plaintiff "yanked" his arm from Defendant Martin's tight grasp. (Doc. No. 17 at 6). Defendant Martin let go of his arm and Plaintiff walked into his cell. When he was all the way into his cell towards the bed, still handcuffed, he turned around to see Defendant Martin standing outside the cell door fumbling with her pepper spray holster. She pointed the pepper spray can at Plaintiff so he turned his head and closed his eyes. He felt the chemicals hitting his hair, right jaw, and right ear. He did nothing aggressive towards Martin and felt his life was in danger from this excessive use of force that was unconstitutional and violated prison policy. No other officers was present at the time of Defendant Martin's use of force. (Doc. No. 17 at 6).

Plaintiff was partially blind and tried to remove the pepper spray from his face yet it spread to his eyes. Plaintiff rushed towards Martin outside the cell and punched her face. She tumbled backwards and fell, then Plaintiff jumped on top of her and punched her a few more times. A Code-

4 was called on the intercom. Plaintiff got up off Defendant Martin and backed into his cell to await the first responder officers. Plaintiff told the officers that Defendant Martin pepper sprayed him for no reason and that he acted in self-defense to prevent further harm because he felt his life was in danger. Plaintiff felt officers piling on top of him to bring him down to the floor. They cuffed and shackled him then roughly snatched him off the floor to escort him to lockup in E-unit for detox in the showers. Defendant Martin denied Plaintiff's version of events so he asked to look at the surveillance video footage. Defendant has denied Plaintiff's version of events so he has asked for an investigation and review of the video footage.

Petitioner was having a hard time breathing because of asthma and had a "slight" reaction due to the pepper spray which "almost" caused an asthma attack. (Doc. No. 17 at 8). The spray caused facial swelling and a nurse checkup that came back with no positive vital or blood pressure signs.

Plaintiff seeks Defendant Martin's permanent reassignment to another prison, damages, costs and fees, and discovery including video camera surveillance footage of the incident.

**(2)** **Defendant's Motion for Summary Judgment** (Doc. No. 43)

Defendant Martin argues that summary judgment should be granted in her favor because she did not use excessive force on Plaintiff or otherwise violate his constitutional rights or other rights under federal or state law, and that she should be granted qualified immunity.

With regards to excessive force, Defendant Martin argues that the only issue before the Court is the use of pepper spray. Plaintiff claims he did not present a threat to Defendant Martin or act aggressively towards her, and that he feared for his life. The record demonstrates that Defendant used appropriate and reasonable measures of force to prevent imminent assault. The video shows that Plaintiff's version of events is not reliable. He has presented no credible evidence

upon which a reasonable jury could return a verdict in his favor and, therefore, there are no genuine issues as to any material fact and Defendant should be granted judgment as a matter of law.

Defendant Martin argues that she is entitled to qualified immunity because the undisputed evidence demonstrates that he conduct was objectively reasonable in light of the circumstances and did not clearly violate Plaintiff's constitutional rights. Defendant Martin only applied pepper spray because Plaintiff posed a significant risk to her safety, she did not sue any more force than was necessary to prevent the attack.

**(3)** **Plaintiff's Responses** (Doc. Nos. 75, 76, 78)

Petitioner contends that summary judgment should be denied because there are disputed issues of material fact and that Defendant Martin is not entitled to qualified immunity.

Plaintiff claims that Defendant Martin used excessive force on him twice before he assaulted her and that Defendant Martin's failure to abide by her training and DPS policies, *i.e.*, by escorting Plaintiff alone and failing to call for backup, placed Plaintiff at an increased risk of harm from Defendant Martin. Plaintiff claims that DPS supervisors, including investigating officer Captain Rodney Riles, sided with Defendant Martin, protected her even though she was wrong, and ignored Plaintiff's rights. He denies Defendant Martin's claim that he told her that he was refusing to go back to his cell. The videotape lacks sound so it does not conclusively prove Plaintiff's or Martin's version of events. The video shows that Martin pushed Plaintiff against the wall and pepper sprayed him before Plaintiff assaulted her. Had Martin truly felt threatened, she would have radioed for assistance and, instead of pepper spraying him, she could have closed him inside his cell. Plaintiff further claims that he never gave Defendant Martin a reason to use force on him, that her intention was to harm him, and that she could have prevented the whole incident by calling for help. Plaintiff admits he struck Martin repeatedly after she sprayed him which was

4

in self-defense after she used excessive force on him twice. (Doc. No. 78 at 10).

Plaintiff further claims that he stated that he sustained injuries including difficulty breathing, asthma attack, swelling of the face and eye and that pictures show signs of excessive force. (Doc. No. 78 at 7).

**(4)** **Evidence**[1]

    **(A)** **Affidavit of Pamela Martin** (Doc. No. 68-1)

Defendant Martin states that she was a Correctional Officer at Marion C.I. at the relevant time. On October 6, 2017, she retrieved Plaintiff from recreation for the purpose of escorting him back to his assigned cell. She cuffed him in front of his body because he had a "490," which is a medical note indicating that he needed to be cuffed in front. (Doc. No. 68-1 at 1). During the escort, Plaintiff said he was not going back to his cell and jerked away from Martin's hold. Martin instructed Plaintiff to stop jerking away from him and said that his recreational time was over and he needed to lock down, *i.e.*, be secured in his assigned cell. As the escort continued, Plaintiff again stated that he was not going to lock down and that he wanted more recreation time. Martin again responded that his recreational time was over and he needed to lock down. Plaintiff then attempted to jerk away from Martin so she placed him against the flat surface of the wall to gain control over him and ensure compliance. Plaintiff used profanity towards Martin and told her to let go of his arm. By this time, they were relatively close to Plaintiff's cell. The cell door was open and Martin instructed Plaintiff to calm down and enter the cell. Plaintiff then entered the cell but then suddenly turned around towards Martin and threatened to harm her. At that moment, Martin "felt that a physical assault was imminent, so [she] pulled [her] pepper spray and applied the spray toward [Plaintiff's] face in an effort to prevent he imminent assault." (Doc. No. 68-1 at 2). The

---

[1] This section is not exhaustive.

pepper spray was not effective and Plaintiff rushed toward her and hit her with both of his fists, knocking her backwards to the ground." (Doc. No. 68-1 at 2). Plaintiff continued to strike her with his cuffs on her face, head, left arm, upper chest, and ribs. Defendant Martin managed to grab her radio and called a Code 4 which indicates an assault on staff. At that moment, Plaintiff backed off of her and went back into his cell. Another correctional officer placed Plaintiff on the ground and Defendant Martin assisted in securing him. At no time during this encounter did Defendant Martin use profanity or otherwise act unprofessionally toward Plaintiff. Defendant Martin "used pepper spray on Inmate-Adkins because he was exhibiting violent and aggressive behavior and was threatening to harm [her]." (Doc. No. 68-1 at 3 at ¶ 26).

During the time when Defendant Martin was employed at DPS, standard procedure was to cuff inmates with their arms behind them so that there is "relatively limited mobility in that they are not effectively able to swing their arms, hands, and cuffs." (Doc. No. 68-1 at 3). "However, an inmate cuffed with hands in the front has more mobility in that they can generally swing their arms, hands, and cuffs" and thus "presents more of a risk than one who is cuffed in back." (Doc. No. 68-1 at 3). Defendant Martin recognized during this incident that Plaintiff posed a greater risk of causing her harm because he was cuffed in front. (Doc. No. 68-1 at 4).

"[T]he safest way, and thus the best practice, to escort an inmate into a cell is for the inmate to enter the cell face forward and remain facing forward until the cell door is fully secured." (Doc. No. 68-1 at 4). After the door is secured, the inmate is instructed to place their hands through the slot so restraints can be removed. "[W]hen an inmate turns around and toward an officer before the door is secured, there is a greater risk that the inmate could assault staff. This is particularly true when an inmate is cuffed in the front." (Doc. No. 68-1 at 4 at ¶ 34-35). "Accordingly, when Inmate-Adkins turned toward [her], while cuffed in front, and began to threaten bodily harm, [she]

6

felt that a physical assault was imminent." (Doc. No. 68-1 at 4).

Defendant Martin "did not use pepper spray for the very purpose of inflicting pain or harm on Inmate-Adkins. Instead, [she] used pepper spray in an effort to deter an attack and defend [herself], and only after [she] perceived an imminent risk of harm." (Doc. No. 68-1 at 4).

**(B)** **<u>Affidavit of Rodney Riles</u>** (Doc. No. 68-2)

Correctional Captain Rodney Riles investigated the use of force incident pursuant to DPS's Use of Force Policy. His investigation into the incident revealed that the incident began when Defendant Martin retrieved Plaintiff from recreation for the purpose of escorting him to his assigned cell, and the events described in Defendant Martin's affidavit occurred.

Correctional Officer Mark Bensley responded to the call, approached Plaintiff cautiously, and directed him to get on the ground. Plaintiff refused, so Officer Bensley used both hands to place him on the ground. Other correctional staff responded to the area and assisted in transitioning Plaintiff from cuffs in the front to cuffs in the back due to his assault on Martin. Staff then escorted Plaintiff to the restrictive housing unit where he was placed in a shower with access to cool water for decontamination. Plaintiff was examined by nursing staff shortly after the incident. Plaintiff only reported pain in his wrist and ankle and exhibited no physical injuries.

As part of his investigation of the incident, Riles viewed video footage of the incident. The video clearly shows Plaintiff jerking his arm away from Defendant Martin during the escort and as he was entering the cell. The video also shows Plaintiff turn towards Defendant Martin as he moved into the cell. At that moment, Officer Martin reached for, and deployed, her pepper spray. Plaintiff can be seen turning away to avoid the initial application of pepper spray then lowers his head and rushes at Officer Martin, knocking her to the ground and striking her head with his cuffed hands.

After completing the investigation, Riles concluded "that the use of force used by all correctional staff involved, including Officer martin was reasonable and appropriate." (Doc. No. 68-2 at 6). The use of pepper spray "was used to stop an assault on staff and to properly control a violent offender. (Doc. No. 68-2 at 6).

The Use of Force Policy authorizes correctional staff to use whatever degree of force appears reasonably necessary to defend themselves or a third party from imminent assault. The Policy provides that pepper spray should be used as a first level response, as opposed to hands-on use of force, and that pepper spray should be used to control or deter a violent, threatening, or aggressive acting offender. Based on Riles' investigation and knowledge of the event, Plaintiff posed a risk of imminent assault on Defendant Martin when he turned toward her, with his hands cuffed in front, and threatened to harm her. After observing Plaintiff's actions, Defendant Martin "felt that an assault was imminent and so she deployed pepper spray in an effort to prevent him from assaulting her and to deter his violent, threatening, and aggressive actions." (Doc. No. 68-2 at 6-7). Riles therefore concluded, based on his investigation and knowledge of the event, that Defendant Martin's use of pepper spray was employed in accordance with the Use of Force Policy.

**(C)** **Affidavit of Christopher Surratt** (Doc. No. 68-6)

Lieutenant Christopher Surrat is familiar with the Use of Force Policy, reviewed the Incident Report that details Defendant Martin's use of pepper spray on Plaintiff, and reviewed the video footage depicting this incident. He concludes that an imminent risk of assault existed when Plaintiff, who was cuffed in front, entered his cell, turned around before his cell door was closed, and threatened her. Accordingly, the use of pepper spray towards Plaintiff was a reasonable use of force that complied with DPS policy.

**(D)** **Use of Force Policy** (Doc. No. 68-3)

The NCDPS Use of Force Policy authorizes correctional staff to use "whatever degree of force that reasonably appears necessary to defend the officer or a third party from imminent assault." (Doc. No. 68-3 at 2-3). "Reasonable force is authorized in order to … ensure compliance with a lawful order…." (Doc. No. 68-3 at 2). The use of force is permissible "only to the extent reasonably necessary for a proper correctional objective. (Doc. No. 68-3 at 2). This does not mean that staff must suffer an assault on their person before taking appropriate defensive action. (Id.). Pepper spray, if feasible, should be used as the first level of response to control or deter violent, threatening or aggressive acting offenders. (Doc. No. 68-3 at 4). Hands-on physical force may be used to restrain or move a non-aggressive, non-compliance offender or to subdue an aggressive offender when pepper spray is not effective or feasible. (Doc. No. 68-3 at 4).

**(E)   Incident Report** (Doc. No. 68-5)

The Report recounts Captain Riles' summary of facts and findings with regards to the incident.

The section addressing medical comments states that Plaintiff said in the post use of force assessment that his wrist and ankle were hurting but he exhibited no physical injuries and appeared to be in no distress. (Doc. No. 68-5 at 6). The Report also includes a Witness Statement by Nurse Michael Moody Witness indicating that there were no physical injuries to Plaintiff. (Doc. No. 68-5 at 28).

Plaintiff's Witness Statement is attached to the Report. (Doc. No. 68-5 at 29). In it, Plaintiff states that Defendant Martin was arguing and using profanity towards Plaintiff, that she pushed him against the wall, gripped Plaintiff's arm hard, and pepper sprayed him for no reason.

**(F)   Plaintiff's Affidavit** (Doc. No. 75-3)

In an affidavit in opposition to summary judgment, Plaintiff states that he was victim of

9

unlawful excessive force. Defendant Martin did not have an assisting officer to escort Plaintiff to his cell. Defendant Martin gripped Plaintiff tightly and Plaintiff started jerking his body and arm because Martin was hurting him. (Doc. No. 75-3). Plaintiff instructed Martin to stop gripping him so tightly because she was hurting him. He stopped walking and told her that she was hurting him and she ignored the situation. Plaintiff kept telling Martin that she was gripping him too tightly. (Doc. No. 75-3 at 2-3). Defendant Martin used profanity toward him and said that she can handle him so don't push her. Plaintiff then "decided to jerk [his] arms off her tight grasp cause she was hurting [him], so Pamela Martin physically assaulted [Plaintiff] and push[ed him] against the wall and said (profanity) and other things towards [him].… Adkins laughed at Pamela Martin because the situation surprised [him] and it was funny what she done to [him]." (Doc. No. 75-3 at 3). They kept walking and were arguing about why she assaulted Plaintiff for no reason. Plaintiff told Martin she needed to loosen up on his arm when they were close to his cell. Martin radioed the control booth officers to open his cell and they did so, and Plaintiff "instructed Martin to stop gripping [his] arm so tight." (Doc. No. 75-3 at 3). Plaintiff then entered his cell and Martin still had a tight grip on his arm. As Plaintiff turned around while still inside the cell and prepared for Martin to secure his cell door so his handcuffs could be removed, she pepper sprayed his jaw and hair. (Doc. No. 75-3 at 4). Plaintiff then "rushed Pamela Martin to assault her to prevent no more further assaults from her … and hit her with both fists that Pamela Martin fell on the ground." (Doc. No. 75-3 at 4). Plaintiff struck her with his cuffs on her body, not her face, then he got off of her and went back into his cell because he heard a Code 4 being called for first responders. Over 15 responding officers came to see what happened. Plaintiff told them that Martin assaulted him for no reason. Plaintiff was taken to a detox shower then was seen by a nurse. Plaintiff told the nurse he could not breathe and was going to have an asthma attack, and his face and eyes were swollen

and hurting.

At no time did Plaintiff give Defendant Martin a reason to use force on him twice. Her intention was to harm him. It is not standard procedure to pepper spray or use force on a restrained inmate. Plaintiff knew during the incident that he was at greater risk of being harmed by Martin.

Since the incident, Plaintiff has seen and heard officers do negative things to inmates. They tamper with inmates' and Plaintiff's mail and food and assault inmates behind other officers' backs. Supervisors give no consequences to these corrupt officers.

Martin failed to prevent this whole incident by calling for help. She acted intentionally and purposefully used wrongful excessive force against him which inflicted pain and harmed him. Plaintiff used himself to assault martin because he was assaulted for no reason and was afraid she was going to use her baton on him. He feared for his life from other assaults by her and he did this to defend himself when he perceived an imminent risk of harm.

## II.     LEGAL STANDARDS

**(1)     Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(2)** **Excessive Force**

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," Helling v. McKinney, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. See Hudson v. McMillian, 503 U.S. 1, 1 (1992).

A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Hudson, 503 U.S. at 5, and must result in the denial of "the minimal civilized measure of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." Wilson, 501

12

U.S. at 297, 302-03; Hudson, 503 U.S. at 5, 8. "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Hudson, 503 U.S. 1, 4 (1992); see Wilkins v. Gaddy, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9, 13–14.

**(3)      Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence

13

for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official

action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III. DISCUSSION

Plaintiff contends that Defendant Martin used excessive force by pushing him into a wall and pepper spraying him without any justification. Defendant Martin argues that Plaintiff's non-compliant and threatening behavior justified her use of force in accordance with DPS policy and that she is entitled to qualified immunity based on the reasonableness of her actions.

Plaintiff asserts that he gave Defendant Martin no reason to exert force on him and that a genuine dispute of fact exists for trial with regards to what transpired between himself and

Defendant Martin. However, these arguments are undermined by the videotape of the incident at issue. The videotape clearly shows that Plaintiff was cuffed with his hands in front of his body and was being escorted by Defendant Martin when Plaintiff jerked his hands. Defendant Martin briefly put Plaintiff against the flat wall then resumed the escort. Plaintiff jerked his hands away from Martin for a second time as he entered his cell, then he turned around to face Defendant Martin before the cell door was closed. Defendant Martin then pulled her pepper spray and deployed it towards Plaintiff, but he nevertheless rushed Defendant Martin, knocked her to the ground, and struck her repeatedly while she was down.

Regardless of the words exchanged between Plaintiff and Defendant Martin or the strength of Martin's grip on Plaintiff's arm, Plaintiff's jerking from Defendant Martin's grasp authorized Martin to briefly press him to the wall to regain control, then he jerked away from her a second time and turned in her direction upon entering his cell, which authorized Defendant Martin to deploy pepper spray. See Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) ("Although the undersigned does not make a credibility determination, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). Accord Solomon v. Felker, No. 08-cv-2544, 2015 WL 1469165, at "7 (E.D. Calif. Mar. 27, 2015) ("The factual context of plaintiff's claim of excessive force is implausible because the injuries described in plaintiff's medical records do not support his claim that he was beaten."); Lanier v. Smith, No. 3:08-cv-833, 2009 WL 3853170, at *8 (M.D. Fla. Nov. 18, 2009) (stating that "the medical evidence is consistent with the amount of force Defendants allege they used to restrain Plaintiff and restore order and is inconsistent with Plaintiff's allegations" in his verified complaint). Plaintiff does not

dispute that he jerked away from Defendant Martin twice, that he was frustrated when he entered his cell, and that he turned towards her before the cell door was secured. These admissions combined with the DPS Policy regarding the authorized use of force and video footage of the incident reveal that Defendant used minimal force in response to Plaintiff's non-complying and physically threatening behavior. Defendant will therefore be granted summary judgment on Plaintiff's claims that she used unjustified and excessive force against him.

Defendant Martin has also asserted a qualified immunity defense. Plaintiff has failed to overcome that defense by showing facts that make out a violation of a clearly established constitutional right at the time of the Defendant's alleged misconduct. The video footage and Plaintiff's admissions reveal that Defendant Martin's use of force was objectively reasonable. Although Defendant Martin's actions did not spare her from a violent assault, they were reasonable under the circumstances. The minimal amount of force that Defendant Martin used to regain control over Plaintiff, who posed an increased danger to Martin because his hands were restrained in front of his body, repeatedly jerked out of the correctional officer's grasp, and then turned to face towards Martin before his cell door was secured, is not the type of force that correctional officers would understand to violate any clearly established rights.

The Court has determined as a matter of law that Defendant Martin did not violate a clearly established right; therefore, qualified immunity applies and Defendant's Motion for Summary Judgment will also be granted on this basis.

**IV.     PENDING MOTION**

In his "Notice Motion to Clerk of Court of Defendant Pamela Martin is not to Official State Employee," (Doc. No. 65), Plaintiff notes that Defendant has quit her job, is no longer a State employee. Plaintiff asks the Court to dismiss all of Defendant's lawyer's motions, and to accept

all of Plaintiff's past and future motions against defendant's counsel, to produce Defendant's whereabouts, and to give Plaintiff's a speedy trial/ television settlement.

Plaintiff's Motion will be denied. The fact that Defendant Martin is no longer an active State employee is irrelevant to this case and does not entitle Plaintiff to learn her whereabouts or have judgment entered in his favor. His request for a trial is denied because his case has not survived Defendant Martin's Motion for Summary Judgment.

Plaintiff has also filed a Second Request for Production of Documents, (Doc. No. 77), and First Set of Interrogatories, (Doc. No. 77-1). These discovery requests are untimely and moot in light of Defendant Martin's Motion for Summary Judgment. Therefore it, too, will be denied.

### V. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is granted, Plaintiff's Motions are denied, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 66), is **GRANTED**.
2. Plaintiff's pending Motions, (Doc. Nos. 65, 77), are **DENIED**.
3. The Clerk of Court is instructed to close this case.

Signed: November 4, 2019

Frank D. Whitney
Chief United States District Judge